IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

CLARENCE TAYLOR,

      Plaintiff,

vs.                             CASE NO. 1:16-cv-347-WTH-GRJ

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Disability Insurance Benefits pursuant to Title II of the Social Security Act ("the Act"). (ECF No. 5.) The Commissioner has answered, ECF No. 16, and both parties have filed briefs outlining their respective positions. (ECF Nos. 25, 29.) For the reasons discussed below, it is recommended that the Commissioner's decision be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff filed her Title II application on January 26, 2010, alleging a disability onset date of May 12, 2009. (R. 125–26, 130, 341, 372.) Plaintiff

alleged that he could no longer work due to degenerative disc disease. (R. 377, 391.) His application was denied initially and upon reconsideration. (R. 125–26, 169, 173.) On May 24, 2011, an administrative law judge ("ALJ") issued a decision unfavorable to Plaintiff. (R. 127–37.)

The Appeals Council remanded for further consideration of the medical evidence. (R. 142–44.) The ALJ then held another hearing on October 31, 2012, and again found on February 14, 2013, that Plaintiff was not disabled. (R. 64–93, 146–58.) However, the Appeals Council remanded again on July 25, 2014, this time for further consideration of evidence from a treating source and Plaintiff's residual functional capacity ("RFC"). (R. 164–67.) A different ALJ found that Plaintiff was not disabled on October 15, 2015. (R. 13–27.) After this opinion the Appeals Council denied Plaintiff's request for review on September 17, 2016. (R. 1–3.) Plaintiff then filed the instant appeal. (ECF No. 5.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2000). Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982); *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560. However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505 (2005).[1] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R.

---

[1] All further references to 20 C.F.R. will be to the 2005 version, unless otherwise specified.

Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d).

Fourth, if a claimant's impairments do not prevent him from doing past

relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a

claimant's impairments (considering his residual functional capacity

("RFC"), age, education, and past work) prevent him from doing other work

that exists in the national economy, then he is disabled. 20 C.F.R. §

404.1520(f).

## III.  SUMMARY OF THE RECORD

Plaintiff's medical records cover the time period from 2009 to 2015

and are from the Family Practice Associates, Florida Neurosurgical

Associates, North Florida Regional Medical Center, and Southeastern

Rehabilitation Medicine. Because the issues on appeal relate to Plaintiff's

credibility and the weight given to Dr. Horseman's opinions, the relevant

portions of the medical record, the opinion evidence, the hearing

testimony, and the ALJ's findings are summarized below.

## A.  Medical Evidence

In 2009 and 2010 Plaintiff visited Dr. Horseman at Family Practice

Associates regarding chronic back pain. From March 2009 to August 2010

Plaintiff was not in any acute distress. In December 2009 Plaintiff's lumbar

pain was stable through injection modalities. By August 2010 Plaintiff expressed that he was functioning well enough not to graduate beyond hydrocodone. Dr. Horseman also noted that Plaintiff received duplicate prescriptions for hydrocodone. (R. 459–62, 502–04, 602.)

Plaintiff also visited Dr. Scott at Florida Neurosurgical Associates in 2009 and 2010 for back and left leg pain. In June 2009 Dr. Scott performed a lumbar re-exploration left L4/5 with repeat discectomy at North Florida Regional Medical Center, but Plaintiff did not immediately show improvement following surgery. Plaintiff's subsequent treatment consisted of medications and physical therapy. (R. 337–38, 466, 470–92, 534–35, 539–40.)

In September 2009 Plaintiff had a post-surgery MRI, which showed interval left L3/L4 laminectomy and moderate left neuroforaminal narrowing with ventral epidural scar formation. No changes in moderate foraminal narrowing at L4/L5 or L5-S1, moderate central spinal senosis L2-L4, or right paracentral disc protrusion L1-L2 were noted when compared to the May 2009 MRI. There was also no evidence of recurrent disc protrusion. Dr. Scott believed Plaintiff would benefit from an implanted spinal cord stimulator. (R. 337–38, 466, 470–92.)

In August 2010 Dr. Scott concluded that Plaintiff has multilevel stenosis. Plaintiff also had a follow-up MRI performed in August 2010, which showed interval maturation of the post-operative changes on the left L3-4 but was otherwise unchanged compared to the September 2009 MRI. By October 2010, severe multilevel spondylosis was noted as well as mild to moderate central canal narrowing at L2/3 and L4/5. There was mild foraminal narrowing at L5-S1, moderate central stenosis at L4/5, and mild canal narrowing at L2/3. Additionally, there was significant stenosis at L4/5. Dr. Scott suggested an L2/3 and L4/5 bilateral laminotomies, foraminotomies and ILIF procedures. Dr. Scott also expressed concern that Plaintiff was receiving narcotics from multiple other sources, including Dr. Horseman, Dr. Puente, and Dr. Guskiewicz. (R. 501, 612–13, 657, 660–63, 667–70, 674.)

In November 2009 through February 2010 Plaintiff visited Dr. Guskiewicz at Southeastern Rehabilitation. In November 2009, Dr. Guskiewicz believed Plaintiff's pain syndrome was consistent with facet arthropathy. Plaintiff walked with a slight, shuffling gait, but overall he had good motor strength. In January 2010 he received intraarticular facet injections at the bilateral L4-5 and L5-S1 area to address his lumbar facet

arthropathy. In February it was reported that although he had good initial mobility in his back, his pain intensity remain unchanged. Dr. Guskiewicz recommended TENS unit therapy rather than spinal cord stimulation. (R. 463–65, 467–69, 506–14.)

In March 2010 Dr. Puente-Guzman of Southeastern Rehabilitation completed a Comprehensive Medical Evaluation. Plaintiff was in no acute distress and ambulated without assistive device, although he did have a stiff posture in the low-back area. He had a significant limited motion of the thoracolumbar spine region, but his hip, knee, and ankle range of motion were functional. (R. 583–91.)

Plaintiff continued to see Dr. Puente-Guzman at Southeastern Rehabilitation in May through August 2010. Throughout his visits Plaintiff was in no acute distress with no abnormal pain behavior, and he walked into the clinic with normal gait and no assistive device, although he did have limited thoracolumbar range of motion. Like Plaintiff's other doctors, Dr. Puente-Guzman noted that Plaintiff had a reported history of polypharmacy use from different providers. (R. 569–80, 615–17.)

In November 2010 Plaintiff returned to North Florida Regional Medical Center, and Dr. Scott performed lumbar re-exploration L2-3 and

L4-5 with bilateral hemilaminotomies and foraminotomies as well as

interlaminac instrumented fusion L2-3 and L4-5. Plaintiff was also fitted

with a bone growth stimulator. (R. 536–37, 541–58, 567–68, 608–09,

640–44, 684.)

Dr. Scott continued to see Plaintiff following this surgery. In

November and December 2010 most of the radicular pain in his leg had

resolved, and by January 2011 Plaintiff was making good progress after his

fusion operation and was not having anymore radicular symptoms. Dr.

Scott also noted that Dr. Puente was encouraged by Plaintiff's progress

too. A flexion extension x-ray exam was performed, with stable findings

and no abnormal motion. In March 2011 Plaintiff reported he had been

doing fairly well until an acute onset of back pain while lifting an empty TV

tray. (R. 620–37.)

In April 2011 another MRI was performed, which included

postsurgical changes with instrumentation at L2/3 and L4/5, mild

degenerative changes and small central protrusion at L1/2, mild stenosis

due to a disc bulge at L2/3, mild acquired stenosis with disc bulge at L3/4,

moderate to advanced degenerative changes and laminotomy defects at

L4/5, and moderate to advanced degenerative changes in the discs at L5-

S1. (R. 807–09.)

Plaintiff's May 2011 exam findings revealed posterior interspinous fusion at L2-3 and L4-5 as well as severe multilevel degenerative spondylosis, but in June 2011 Plaintiff expressed a desire to return to work in a light duty capacity. In July Plaintiff returned to light duty work doing phone sales before stumbling and hurting his back. At this time he had a very tight back and very limited range of motion. (R. 744–756, 764–70, 775–76, 791–805.)

Plaintiff's August 2011 MRI findings were stable with no significant interval findings compared to the April MRI, although disc degeneration at multiple levels was noted. In November 2011 he went to the emergency room regarding his pain, where he received steroid and pain medication. At the emergency room he had a CT that revealed stable moderately advanced degenerative disc disease with varying degrees of spinal canal and neuro-foraminal stenosis, but there were no acute findings. Plaintiff's December 2011 MRI showed advanced multilevel disc degeneration with some degree of foraminal of central stenosis at multiple levels, but there were no significant changes from his August 2011 MRI. (R. 744–756, 764–70, 775–76, 791–805.)

In January 2012 it was reported that Plaintiff's MRI showed no significant changes from August, and Dr. Scott stated that his MRI and CT appear stable. Dr. Scott noted that there was no need for further surgery but that Plaintiff might benefit from additional physical therapy. (R. 744–756.)[2]

Following the November 2010 surgery Plaintiff also visited Dr. Puente-Guzman at Southeastern Rehabilitation. In December 2010 Plaintiff reported improvement in leg pain. From December 2010 to August 2011 Plaintiff was in no acute distress without abnormal pain behavior, and he walked into the clinic with normal gait and no assistive device, although had times he had limited motion of thoracolumbar spine with mild muscle rigidity. In March the doctor noted that he would "start tapering down medication over the next couple months." In August Plaintiff reported he was doing relatively well and was working but had to miss a few days, so

---

[2] Dr. Scott also issued reports regarding Plaintiff's worker's compensation claim. From June 2009 through October 2010 Plaintiff could not perform work at even a sedentary level, and he was totally temporarily disabled ("TTD"). In March 2010 Dr. Scott believed Plaintiff was capable of some sedentary work, and by August 2010 Dr. Scott said he could return to work although he had permanent sedentary restrictions. Plaintiff was again TTD for Worker's Compensation purposes as of December 2010 as a result of this surgery. However, Dr. Scott found Plaintiff capable of light duty work in August 2011 and permanent light duty by January 2012. (R. 337–38, 466, 470–92, 501, 659, 666, 677.)

he was let off. In December 2011, however, Plaintiff used a straight cane. (R. 559–66, 722–26, 740–42, 746–48, 786–90.)

Further, Dr. Puente-Guzman noted that Plaintiff's August 2011 MRI revealed stable findings with no significant interval findings compared to the April 2011 MRI, including no new compressive lesions, although his x-rays revealed disc degeneration of multiple levels. (R. 736–39.)

In January through March 2012 Plaintiff was in no acute distress without unusual pain behavior and with functional range of motion in all extremities, although he did experience limited thoracolumbar range of motion and used a straight cane during one visit. In February 2012 although he complained of low back pain, his seated SLR test was otherwise unremarkable. In March Plaintiff exhibited pain behaviors, but they were appropriate for his diagnoses. Plaintiff, however, deferred a spinal cord stimulator or having another surgical intervention  (R. 700–06, 710–18, 816–27.)

In 2011 and through his date last insured in March 2012 Plaintiff also returned to Dr. Horseman at Family Practice Associates. The limited records show that in March and October 2011 he appeared in no acute distress. (R. 596, 831–32.)

The medical record also includes records from after his date last insured, which was March 31, 2012. These records show that Plaintiff was alert, oriented, in no acute distress, and demonstrating no aberrant pain behaviors. Plaintiff also had functional use of all extremities and adequate analgesic effect and improved status from his medication. By July 2012 Plaintiff even "described good increase in functionality compared to the previous 1–2 years prior to Roxicodone." He was also participating in substantially more activities and hoping to lose weight. From November 2012 onward he reported that he was continuing to do well and experiencing improved pain control. (R. 685–98, 810–815, 828–30, 835–70.)

## B.  Opinion Evidence

### 1. State Agency Evaluators

In March 2010, Ms. Tredik completed a Physical RFC assessment. She found that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently. Plaintiff could sit, walk, and stand for about 6 hours in an 8-hour workday. Plaintiff had postural limitations including only occasionally crouching and climbing ladders, ropes, or scaffolds, as well as only frequently balancing, stooping, kneeling, crawling, and climbing ramps

or stairs. Plaintiff did not, however, have any manipulative, visual, communicative, or environmental limitations. (R. 493–500.)

In April 2010, Dr. Kline completed a Physical RFC assessment. His exertional limitations were the same as those found by Ms. Tredik. However, Dr. Kline found that Plaintiff could never crawl or climb ladders, ropes, or scaffolds. Additionally, Plaintiff could only occasionally balance, stoop, kneel, crouch, and climb ramps or stairs. But again Plaintiff had no manipulative, visual, communicative, or environmental limitations. (R. 515–22.)

### 2. Dr. Horseman

In March 2011 Dr. Horseman completed a Clinical Assessment of Pain, which is a checkbox form for use by treating physicians. Dr. Horseman believed that based on his objective findings that Plaintiff experienced marked pain. Dr. Horseman also indicated that Plaintiff had extreme restriction in the ability to complete a normal workday and workweek without interruptions from pain and to perform at a consistent pace without an unreasonable number and length of rest periods. Additionally, Plaintiff had marked restriction in the ability to perform activities within a schedule, maintain regular attendance, and be punctual

within customary tolerances. Plaintiff, however, had only mild restriction in the ability to maintain attention and concentration for extended periods and the ability to interact appropriately with the general public. As explanation for these findings, Dr. Horseman said only that Plaintiff had advanced multilevel arthritis of the cervical and lumbar spine. (R. 524–29.)

Dr. Horseman also completed an RFC evaluation in March 2011. Without explanation, he concluded that Plaintiff could sit and stand for 30 minutes to 1 hour at one time and sit and stand for a total of 3 to 4 hours per day. For a job with a sit/stand option, Plaintiff could work for 3 to 4 hours per day. As for lifting, Plaintiff can frequently lift 1 to 5 pounds and occasionally lift 5 to 9 pounds. (R. 530–33.)

On October 12, 2012—after Plaintiff's date last insured—Dr. Horseman wrote a letter stating that Plaintiff has long-standing lumbar pain and degenerative joint disease of the lumbar spine. Dr. Horseman opined that Plaintiff meets the diagnostic criteria for lumbar spine degenerative joint disease with neuroanatomic nerve root compression and associated physical findings. Dr. Horseman also said that Plaintiff has the diagnosis of lumbar spine stenosis and a degree of neurogenic claudication occurring and that he has limited ambulation. (R. 286.)

### 3. Debbi Shon, MPT

In August 2011 Debbi Shon completed a Functional Capacity Evaluation. It was noted that Plaintiff did not demonstrate maximum effort or appropriate pain behaviors, so the findings do not represent Plaintiff's potentially true capabilities. Ms. Shon concluded that based on static strength testing Plaintiff can perform light work. The non-material handling testing indicated that Plaintiff can sit for frequent intervals and alternate sit-stand for frequent intervals. Further, Plaintiff can walk for occasional intervals. The musculoskeletal exam revealed functional bilateral extremity active range of motion, although Plaintiff demonstrated decreased lumbar spine active range of motion. Plaintiff also demonstrated normal bilateral upper and lower extremity strngth during manual muscle testing. In conclusion, his physical demand classification was Light-Medium. (R. 729–35, 779–85.)

## C. Hearing Testimony

During the hearing held on July 15, 2015, Plaintiff was 51 years old. Plaintiff testified that he was injured on the job in 2007 when he was working as a local truck driver. Since that injury he has had two back surgeries, with the last one occurring in 2010. However, he has had a total

of four back surgeries in his lifetime. (R. 34–38.)

Plaintiff also testified about his normal activities, including chores. He said he cooks in the evenings, although not every night, and helps with clothes. He also goes to the store with his wife to shop if he is able to use one of the carts, watches a lot of television, and sees other family members including his three children and seven grandchildren.(R. 39–43.)

Plaintiff also said he could walk about 25 yards to the chicken pen and back but that he is tired after that. He tends the chickens, which includes feeding them, ensuring they have water, and picking up the eggs two or three days a week. He also said he could lift up to about 18 pounds. (R. 49–41.)

Plaintiff mentioned that he would like to get back into the workforce but he does not know many jobs that would allow for his bad days. Additionally he said he has 10 to 15 good days, 10 bad days, and 5 really bad days. On his bad days he has to stay on pillows and use a heating pad, but even on his good days he uses these pillows three or four times. Plaintiff said there is no rhyme or reason to when he has a good day versus when he has a bad day. (R. 44–47, 54.)

Plaintiff also testified about his ability to do certain activities. He said

he could sit in one place for 15–20 minutes, but then he must walk around for about 2–5 minutes. Plaintiff said that he also has a cane because Dr. Scott told him he needed one, and he uses it about 7 to 10 days a month. He also said he has a walker that he rarely uses. Plaintiff cannot bend or stoop, but he can squat while holding on to something, walk up three stairs, and reach overhead. As for sleep, Plaintiff said he has to wake up in the night due to pain to take medication. (R. 48–59.)

Plaintiff said he takes narcotic medications for his pain and breakthrough medication two to four times a month. He also said this medication affects his memory and concentration. (R. 59–60.)

## D.  The ALJ's Findings

The ALJ found that Plaintiff has not engaged in substantial gainful activity since his alleged onset date of May 12, 2009, through March 31, 2012, his date last insured. The ALJ also found that he has the following severe impairments: degenerative disc disease of the cervical spine and lumbar spine status post 2 laminectomy and discectomy surgeries. However, none of these impairments, or a combination thereof, meets or medically equals the severity of one of the listed impairments. (R. 19.)

Based on the entire record, the ALJ concluded that through the date

last insured, Plaintiff had the residual functional capacity ("RFC") to

perform light work, except he required a 30-minute sit/stand option. He

could also only occasionally climb and kneel, and he should avoid crawling,

bending, stooping, and concentrated exposure to vibrations. (R. 19.)

The ALJ then found that Plaintiff was not capable of performing any

past relevant work. However, the ALJ found that through the date last

insured there were jobs that existed in significant numbers in the national

economy that Plaintiff could have performed, including Cashier II, Ticket

Seller, and Ticket Taker. Accordingly, the ALJ concluded that Plaintiff was

not under a disability at any time from May 12, 2009, the alleged onset

date, through March 31, 2012, the date last insured. (R. 25–26.)

## IV.  DISCUSSION

Plaintiff raises the following two arguments on appeal: (1) the ALJ

erred in his assessment of Plaintiff's credibility, and (2) the ALJ erred by

not giving greater weight to Dr. Horseman's opinions. Each argument is

discussed in turn below.

## A. The ALJ properly evaluated Plaintiff's credibility, and his determination is properly articulated and supported by substantial evidence.

Plaintiff first argues that the ALJ erred in his credibility assessment

by finding Plaintiff not entirely credible without any evidentiary basis for doing so. Specifically, Plaintiff says that substantial evidence supports Plaintiff's testimony regarding his level of pain, including the opinions of his treating physicians and the reality that Plaintiff has undergone four unsuccessful back surgeries. Plaintiff also quoted the ALJ's discussion of Dr. Scott's medical records in support of his argument. Further, Plaintiff argues that the ALJ failed to give adequate reasons for discrediting Plaintiff's testimony. (ECF No. 25 at 33–36.)

If the ALJ decides to discredit the claimant's testimony as to her subjective symptoms, the ALJ must articulate explicit and adequate reasons for doing so or the record must be obvious as to the credibility finding. *Foote v. Chater*, 67 F.3d 1553, 1561–62 (11th Cir. 1995). While the ALJ does not have to cite particular phrases or formulations, broad findings that a claimant was not credible and could work are, alone, insufficient for the Court to conclude that the ALJ considered the claimant's medical condition as a whole. *Id.* at 1562. The ALJ's articulated reasons must also be supported by substantial evidence. *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991). The Court will not disturb a properly articulated credibility finding that is supported by substantial

evidence. *Foote*, 67 F.3d at 1562.

> In this case the ALJ determined that Plaintiff's
>
> medically determinable impairments could reasonably be
> expected to cause some of the alleged symptoms; however,
> [Plaintiff's] statements concerning the intensity, persistence
> and limiting effects of these symptoms are not credible to the
> extent they are inconsistent with the above residual functional
> capacity assessment through the date last insured. Specifically,
> the objective medical evidence does not support the level of
> limitation caused by [Plaintiff's] alleged subjective experience of
> symptoms. Accordingly, the [ALJ] cannot simply accept
> [Plaintiff's] assertions as [to] his maximum capabilities during
> the years of 2007 through March of 2012.

(R. 23.) Substantial evidence supports the ALJ's credibility determination.

In making the credibility assessment, the ALJ considered the medical

and opinion evidence, Plaintiff's daily activities, and Plaintiff's subjective

statements about the intensity, persistence, and limiting effects of his

symptoms. Specifically, the ALJ "considered all symptoms and the extent

to which these symptoms can reasonably be accepted as consistent with

the objective medical evidence and other evidence . . . . [The ALJ] also

considered opinion evidence." (R. 19–24.)

The ALJ first discussed Plaintiff's three hearings, during which he

testified about his neck and back pain, his treatment, his daily activities and

chores, and his alleged limitations. With regard to the most recent hearing

in July 2015, the ALJ noted that Plaintiff testified that he wanted to return to work but that he was unsure if there were jobs that would accommodate his "bad days," stating that he has 10–15 good days per month. He said he sometimes uses a cane or walker, and he avoids stairs when possible, but he can squat down while holding on to something. Further, Plaintiff testified that he can only sit for 15–20 minutes, stand and walk for 2–5 minutes, and carry about 18 pounds. His activities include cooking, tending chickens, collecting eggs, playing with his children and grandchildren, attending parties, shopping, doing chores, and watching television. For treatment of his impairments, Plaintiff takes pain medication and uses a heating pad. (R. 20, 34–62.)

After considering Plaintiff's testimony and the medical record, the ALJ found that "[t]he medical evidence of record through the date last insured simply does not support a finding of disability even with his 4 surgeries and ongoing pain management treatment." (R. 21.) The ALJ also found that the medical evidence was inconsistent with Plaintiff's statements and with his daily activities. *See Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (noting that reports of daily activities are also a proper consideration in making a credibility determination).

The ALJ provided an in-depth discussion of the medical evidence. The ALJ noted Plaintiff's back injury from an industrial accident around February 2007 and his history of back problems and surgeries in the 1990s. He discussed Plaintiff's June 2009 back surgery, which was a re-exploration of the left L3-4 with repeat microdiscectomy as well as epidural steroid injections. The ALJ noted that Plaintiff's post-surgical MRI was consistent with the left L3-4 laminectomy defect with left neuroforaminal narrowing and moderate central spinal stenosis at L2-3. His August 2010 MRI revealed normal vertebral bodies and that there were "no changes in the appearance of the lumbar spine when compared to the prior exam," other than some maturation of postoperative changes on the left at L3-4. (R. 21, 463–65, 548–49.)

The ALJ noted that following this surgery Plaintiff was seen by Dr. Horseman and Dr. Guskibwicz. He highlighted that Dr. Horseman noted in December 2009 that Plaintiff was "overall stable in terms of lumbar pain through injection modalities." The ALJ also found that throughout his treatment Plaintiff was not in acute distress upon physical examination.[3] He

---

[3] This finding is consistent with the later medical records from Dr. Puente-Guzman and Dr. Depaz, which showed that despite Plaintiff's reported pain, he was in no acute distress, did not exhibit abnormal pain behavior, and walked with a normal

also highlighted that in January 2010 Dr. Guskibwicz administered a facet

injection and noted that Plaintiff was "doing quite well" and was able to

"rotate his torso . . . in a comfortable basis." (R. 21–22, 459–62, 465, 504,

559–71, 576–78, 583–89, 615–17, 693–95, 700–01, 716–18, 721–26,

740–42, 786–88.)

The ALJ also discussed treatment records from Dr. Scott, the

surgeon who performed the June 2009 surgery and examined him during

follow-up visits. Dr. Scott's findings included back spasms, limited range of

motion, positive straight leg raises, and at times a moderate antalgic gate

and inability to squat. He also found, however, that Plaintiff's motor

functioning was intact, that he could walk on his heels and toes, and that

he had normal grip strength and fine dexterity. Following a second surgery

in November 2010 Dr. Scott noted that Plaintiff was making good progress[4]

and not having radicular symptoms. In April 2011 MRI Dr. Scott noted that

Plaintiff's subjective complaints of pain were "not well explained on the

current MRI." By 2012 Dr. Scott found Plaintiff's MRI and CT scan stable

---

gait. (R. 459–62, 465, 504, 559–71, 576–78, 583–89, 615–17, 693–95, 700–01, 716–18, 721–26, 740–42, 786–88.)

[4] According to Dr. Scott's notes, Dr. Puente was also encouraged by Plaintiff's progress as of January 2011. (R. 626.)

and recommended physical therapy, stating that no further surgical

intervention was necessary.  (R. 20–23, 501, 612, 620–21, 626, 629, 633,

744–56, 777.)

Overall, the medical record includes records from doctors and other

medical professionals that undermine Plaintiff's credibility. As discussed

above, the records show improvement, particularly after his 2010 surgery.

Additionally, despite Plaintiff's allegations of severe limitations and

complaints of pain, the record also reveals that Plaintiff often appeared in

no apparent distress and often walked normally without assistive device

and that on examination his muscle and motor strength are often described

as intact, good, or within normal or functional limits. While the records do

show limitations—as accounted for the in ALJ's RFC determination—they

do not support Plaintiff's testimony regarding the severity of his pain and

limitations. (R. 487, 513, 570, 586–87, 596, 615, 629, 694, 700, 704–05,

717, 735, 741, 746, 814, 817, 826.)

The ALJ also discussed the opinion evidence in the record, giving

greater weight to the opinion evidence that is most inconsistent with

Plaintiff's testimony. For example, the ALJ gave great weight to the

opinions in the record that concluded Plaintiff was capable of light

exertional work, such as the August 2011 Functional Capacity Evaluation,

because the ALJ found this conclusion to be consistent with the overall

evidence in the record, including the objective findings and notations in the

treatment records of Dr. Scott and Dr. Horseman. Additionally, the ALJ

gave little to no weight to Dr. Horseman's checklist RFC assessment and

2012 letter—which included more severe limitations—because he provided

no rationale for his opinions and because they were not supported by Dr.

Horseman's treatment records or the other evidence in the record. (R.

22–23.)

    In addition to the inconsistencies between Plaintiff's testimony and

the medical and opinion evidence in the record, the ALJ also noted that

there were other reasons Plaintiff's credibility was diminished. For

example, Plaintiff's credibility was diminished by the fact that Plaintiff was

seeking narcotics from several providers at the same time and because

there is evidence in the record that Plaintiff was potentially drug seeking,

as noted by several of Plaintiff's treating doctors. His credibility was also

diminished by the fact that during his August 18, 2011, Functional Capacity

Evaluation, he did not perform with consistent effort and demonstrated

inappropriate pain behaviors. (R. 22, 23, 560, 563, 565, 570, 576, 679,

723, 735, 775.)

Evidence of drug-seeking behavior and inappropriate pain behaviors is appropriate to consider when making a credibility determination. *See McLain v. Comm'r, Soc. Sec. Admin.*, 676 F. App'x 935, 938 (11th Cir. 2017) ("Further, in considering a claimant's subjective pain for the RFC assessment, we have approved of an ALJ's observation that the claimant's medical history contained notes of embellished and magnified pain behaviors, as well as drug-seeking manipulative tendencies."); *Moore v. Barnhart*, 405 F.3d 1208, 1212–13 (11th Cir. 2005.).

After discussing all of this evidence in the record, the ALJ found that Plaintiff "is not as limited as alleged according to his treating physicians and his reported level of activities. Because of the inconsistencies in his testimony and reports to various physicians regarding his level of functioning and ability to perform certain activities, the objective evidence is found to be a more reliable source of information and given greater consideration." (R. 24.)

As is evident in the ALJ's opinion, the ALJ properly considered Plaintiff's testimony and his daily activities, the objective medical evidence, and the opinion evidence in the record, ultimately finding that Plaintiff's

testimony was not entirely credible. The ALJ was not clearly wrong to

discredit Plaintiff's testimony as evidenced by the record as a whole and

the ALJ's opinion. *See Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935,

939 (11th Cir. 2011) (noting that "[t]he question is not . . . whether ALJ

could have reasonably credited [the plaintiff's] testimony, but whether the

ALJ was clearly wrong to discredit it"). Because the ALJ's credibility

assessment is properly articulated and supported by substantial evidence,

the Court concludes that the ALJ did not err in his credibility assessment.

## B. The ALJ had good cause to give little to no weight to Dr. Horseman's opinions, and substantial evidence supports the ALJ's decision to do so.

Plaintiff also argues that the ALJ violated the treating physician rule.

Specifically, Plaintiff argues that the ALJ's analysis regarding Dr.

Horseman's opinions is "facially erroneous. Not only because a reasonable

person would see the objective evidence of 4 lumbar back surgeries as

proof of severe intractable back pain unrelieved by surgery, but because

light duty has no equivalence to Light work, a term of art to the defendant

Commissioner." (ECF No. 25 at 40–44.) Plaintiff offers no other citation or

reference to the record to support his claim that the ALJ violated the

treating physician rule.

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 416.927(d)(2). Nevertheless, the ALJ may discount the treating physician's opinion if good cause exists to do so. *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's] own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991) (citing *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987)).

If an ALJ rejects a treating physician's opinion, he must give explicit, adequate reasons for so doing, and failure to do so results in the opinion being deemed accepted as true as a matter of law. *MacGregor v. Bowen*,

786 F.2d 1050, 1053 (11th Cir. 1986); *Marbury v. Sullivan*, 957 F.2d 837,

841 (11th Cir. 1992). The Commissioner's reasons for refusing to credit a

treating physician's opinion must be supported by substantial evidence.

*MacGregor*, 786 F.2d at 1054.

In addressing Dr. Horseman's opinions, the ALJ discussed Dr.

Horseman's March 2011 clinical assessment of pain and residual

functional capacity assessment as well as his October 12, 2012 letter. Dr.

Horseman's March 2011 clinical assessment of pain included checkmarks

relating to the severity of Plaintiff's pain, indicating that Plaintiff suffers from

marked pain and marked limitation in the ability to perform activities within

a schedule, maintain regular attendance and be punctual within customary

tolerances as well as extreme limitations in the ability to complete a normal

workday and workweek without interruptions from pain and to perform at a

consistent pace without an unreasonable number and length of rest

periods. However, the only explanations for these extreme checkmark

findings were "[a]dvanced multilevel arthritis of cervical and lumbar spine."

(R. 524–29.)

Dr. Horseman's March 2011 RFC assessment also consisted only of

checkmarks without any explanation to support the findings. These findings

included very severe limitations.  The form reflects that at one time, Plaintiff

could only sit for 30 minutes to 1 hour and stand up to 30 minutes. With a

5-minute stretch break every hour, Plaintiff can work for 3 to 4 hours per

day in a job that requires him to sit while working and work for 3 to 4 hours

at a job that requires him to stand while working. If Plaintiff can sit and

stand at will, Plaintiff can work for 3 to 4 hours per day. As for lifting,

Plaintiff can frequently lift 1 to 5 pounds and occasionally lift 5 to 9 pounds.

However, the portion of the form that asks for a brief description of the

clinical data or other objective medical evidence to support the findings is

blank.  (R. 530–533.)

The October 2012 letter—which notably was written six months after

Plaintiff's date last insured—consists of one paragraph stating that Plaintiff

"meets the diagnostic criteria for lumbar spine [degenerative joint disease]

with neuroanatomic nerve root compression and associated physical

findings." It goes on to state that Plaintiff "also has lumbar spine stenosis

and . . . a high degree of neurogenic claudication occurring, very limited

ambulation, use of a cane as needed." Lacking in rationale, it states that

Plaintiff has undergone several surgeries and is treated with opioid pain

medication. The letter also references Plaintiff's physical exam findings for

the date of the letter, but Dr. Horseman's treatment records from October 12, 2012, do not reference any physical exam findings other than vitals. (R. 286, 837–37.)

Rather than according these opinions controlling weight, the ALJ found that they were not supported by the objective record evidence, including Dr. Horseman's own treatment notes, and Dr. Scott's opinion that Plaintiff was capable of light duty work. More specifically, the ALJ found that Dr. Horseman's opinions in his October 12th letter are entitled to no weight because Dr. Horseman did not provide any rationale for his opinions and the medical evidence does not support those opinions. Additionally, the ALJ found that Dr. Horseman's RFC opinion was entitled to only very little weight, noting that "Dr. Horseman's opinion is essentially a dead man's residual functional capacity and not consistent with his own treatment records noting stable conditions, even after his date last insured to March 2015, with increased functioning and improvement and not consistent with the claimant's own reports of his ability to perform limited activities, chores, exercises, etc." (R. 24–25.)

The ALJ had good cause for assigning little or no weight to Dr. Horseman's opinions. The fact that Dr. Horseman's opinions contained no

rationale to support them, were inconsistent with his own treatment records, and were unsupported by the other medical evidence in the record represent good cause to accord Dr. Horseman's opinions less than controlling weight. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (finding good cause where the evidence "supports a contrary finding," the opinion is "conclusory," the opinion is "inconsistent with [the treating physician's] own medical records," and the statement "contains no [supporting] clinical data or information").

The ALJ had good cause to give Dr. Horseman's opinions less weight because it is clear from the opinions—the one paragraph description of Plaintiff's diagnoses and the checklist clinical assessment of pain and residual functional capacity evaluation—that there is no reasoning, rationale, explanations, or reference to the medical record as support for Dr. Horseman's findings. (R. 286, 524–33.)

Second, the ALJ had good cause for affording Dr. Horseman's opinions less weight because Dr. Horseman's opinions are inconsistent with his own treatment notes. For example, despite the severe restrictions in Dr. Horseman's opinions, his treatment notes reflect that Plaintiff was typically in no acute distress and that his extremities were acyanotic

without edema. (R. 459–62, 504, 596, 602, 831–32.) In December 2009 Dr. Horseman found that Plaintiff was "overall stable in terms of lumbar pain through injection modalities." (R. 459.) In August 2010 Plaintiff represented that he was "functioning well enough not to graduate beyond hydrocodone" and stated that he maintained basic activity, such as walking about a half-mile most days and doing yard work. (R. 602.) In March 2011, when Dr. Horseman completed the opinions, Plaintiff was showing a bit of improvement in the pain radiating to his lower left extremity and gave a good rating of the analgesic efficacy of Hydrocodone. (R. 596.) Even after his date last insured, Plaintiff was in no acute distress and said he was receiving "adequate relief," "adequate analgesic effects," "increase in functionality," and improved status from his medications. (R. 828–30.)

Lastly, the ALJ found that Dr. Horseman's opinions were unsupported by the rest of the evidence in the record. The medical evidence, as discussed in greater detail above, included findings from other doctors that Plaintiff was often in no acute distress, walked without an assistive device although at times with a stiff posture, and exhibited good, intact motor strength and functional range of motion in his extremities, although he did have limited thoracolumbar range of motion.

Further, following Plaintiff's November 2010 surgery, Plaintiff made good

progress and was showing improvement, as noted by Dr. Scott and Dr.

Puente, even prior to Dr. Horseman's opinions. (R. 620–37.) And as

mentioned previously, the record also contains notes that Plaintiff was

exhibiting drug-seeking behavior, exerting questionable effort during

testing, and demonstrating inappropriate pain behavior.

As for the opinion evidence, in 2010 the state agency evaluators,

including Dr. Kline, found that Plaintiff could lift and/or carry 20 pounds

occasionally and 10 pounds frequently and sit, walk, and stand for 6 hours

in an 8-hour work day. They also noted some postural limitations. (R.

493–500, 515–22.) The evaluation done after Dr. Horseman's 2011

opinions noted that Plaintiff could, at a minimum, perform light exertional

work, noting that Plaintiff did not demonstrate maximum effort or

appropriate pain behaviors during the examination. (R. 729–35.) All of

these opinions are far less restrictive than the findings by Dr. Horseman,

and the ALJ found them to be more consistent with the record as a whole.

Because the ALJ had good cause for giving very little weight, if any,

to the opinions of Dr. Horseman and because the ALJ provided adequate,

explicit reasons for doing so that were supported by substantial evidence,

the ALJ did not err in his treatment of Dr. Horseman's opinions. *See*

*MacGregor*, 786 F.2d at 1054.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the

decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** on the 20th day of November 2017.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**